Good afternoon, your honors, and may it please the court, yes, this is the third time that we appear before this court in an effort to gain a full and fair hearing on Pellant's claim of prosecutorial misconduct based on the intimidation of a defense witness who then withdrew his testimony. This time our contention is based on the idea that we didn't get a full and fair hearing because mainly we were denied discovery with regard to government spoliation of DNA testable evidence which would bear, that discovery would credibility of the government witnesses and the, yes, Judge Morrow found that the discovery that you were seeking was too attenuated or remote because the issue that we remanded to her was to listen to the testimony and determine the nexus that the spoliation evidence has to the issue that we sent back to the district court. Yes, your honor, the nexus has to do with its potential impact upon the relative credibility of the witnesses. In fact, Judge Morrow... Potential impact? Well, your honor... Is that what you're saying? Potential? I'm a Johnny come new to this case. Yes, yes. I haven't been here before. Yes, your honor. When you say potential, seems to me the only potential there is here is that Mielke and Foltz were government witnesses and they were, or worked for the government and they prosecuted the plaintiff. I don't see any other thing in here that's relevant. Well, your honor, our contention is that it could have impact. Well, your honor, of course, we haven't had the discovery. It's a mystery. I understand, but I guess what I'm trying to say is there, I have to reach a standard. There is a possibility of, it's not enough to say there's just a possibility of a fishing expedition. Your honor... So I guess I'm trying to figure out. I got two people who work for the government and I know they prosecuted your client. That's all I got. It's the only nexus, if you will, as my colleagues suggested, that there is here. Let me suggest further reasons to support a nexus here. Okay. That's what I'm after. Yes. All right. The swatch that we're talking about here that Judge Morrow found was foliated, in fact, by the Department of Justice. Well, she did find it was foliated and she gave you every benefit of the doubt on the foliation by suggesting that Morgan was in the house and Morgan, therefore, could have done something there because he was there. That was the foliate, the fact that this would, that's what she gave you. What I'm saying is, okay, in order for get me to vote for you to have more discovery, I've got to have some nexus. Yes, your honor. Let me suggest the nexus. First of all, this evidence went missing at the particular time when this case was before the district court for the first time in proceedings which could have, were likely to have, led to an evidentiary hearing with regard to these claims at which these two witnesses would have testified. Since I'm Johnny Come Lately, I'm going to go through. It's my understanding that you, your client, wanted to have DNA testing in 2010. Yes. It had nothing to do with Foltz and Mielke at the time. All he wanted was the DNA testing, that it was transported to the LA County, to the private laboratory, and there there was discovered some evidence which was that this evidence had previously gone to the California Department of Justice for a single day at the request of a detective dean. Never been let out otherwise. Isn't that, aren't those the facts? Your honor, just to be more precise about the occasion on which they were let out. They were let out in 2002. This evidence was let out in 2002. I know when it was let out, but it was let out to go to the California Department of Justice for a single day because Detective Dean wanted it to be happening. Well, it was Deputy Sheriff Bean, your honor. Bean? Bean, yes. Is it B-I-E-H-N? That's right, your honor. I'm sorry, I had D then. Yeah, not material, your honor. I hope that's not material. All I'm trying to do is, I'm still trying to find a He isn't involved in that. Foltz isn't involved in that. Well, at that time, at that very time, the evidence was let out during a period of discovery in this case. Not just a kind of random occasion, but during this discovery, and it was Justice Eddie Schor, at the request of a Deputy Sheriff, Mr. Bean, and of course, Milky, the investigating officer in this case, was also a Deputy Sheriff from Los Angeles. Okay, so is that the evidence that you contend establishes the nexus? There's more, your honor. Okay, but at this point, we don't have any Milky. We're working together on the investigation. Well, we don't know that. No, what we know is that we were in a proceeding which the expectation would be would result in the testimony of Foltz and Milky. Right, but the crime that 1988. And then in 2002, for reasons that apparently no one has been able to ascertain at this point, the evidence was released to the California Department of Justice Crime Lab by the Los Angeles County Sheriff's Crime Lab, but returned the same day. And the head of that crime lab, your honor, Sewell, said that this was unprecedented in his experience of 25 years in that laboratory. That evidence... But that doesn't make it relevant, just because it's unprecedented. Well, it's... here we have it in the context of the district court proceeding with regard to this habeas corpus, and it's unprecedented, and the... clearly everybody involved knew that this was evidence that could be relevant to this proceeding. Nobody has that in the record. Oh, absolutely, your honor. It is undisputed that everyone knew that... Everyone? Who are we talking about? We're talking about Bean? We're talking about everyone involved in those proceedings, your honor, and that is... You're talking about the proceedings which were happening outside of this particular situation. I'm sorry. As I understand it. Outside? I'm not... you said everything in this proceeding, but this proceeding is not even... I mean, we don't even know that it has any relevance to this proceeding. All we know is that it went down there because Bean allowed it to happen. Well, your honor, it would be an extraordinary coincidence if it didn't have anything to do with the discovery proceedings that were then going on, which focused specifically, for one thing, on this piece of evidence. Let me... let me ask you a question. Yes, your honor. In... normally in a habeas case, you're not allowed any discovery, are you? Your honor, I know that it can be requested. I know it can be requested, but normally you're not supposed to get any, are you? Your honor, right now I cannot... I cannot speak to that. I have... I'm afraid I don't have an answer. Bracey v. Gramley, United States, 520 U.S. 8899, says plaintiff is not entitled to discovery in the ordinary course of a habeas proceeding. So then I went from there, and I said, okay, they're normally not entitled. Discovery orders are subject to what standard of review? Abuse of discretion. So normally not allowed. Abuse of discretion is my review, and only in this case law. If the discovery is indispensable to a fair and rounded development of the facts, isn't that it? That's correct, your honor. All right, so, and at that point, the best I've got on relevance, you told me, and you're saying I'm supposed to say that the district court abused its discretion? Well, a couple of points. First of all, it has been found that there was foliation here, and secondly... But the foliation has nothing to do with this. I don't have any way to make those two get together. I don't have any way to link them. I know there was foliation, so there was. You also, because of that Morgan is in the house. Yes. Before that, before the foliation, Morgan wasn't in the house. Morgan was, whether he was in the house or whether he wasn't, it was subject to who was talking. But the district court, because of foliation, said no problem. Morgan is in the house. And further, your honor, said that that was relevant to credibility. I understand. And was not satisfied that it changed the... Yes. The district court said it's not relevant to credibility. I'm trying to determine whether or not Foltz and Mielke are telling the truth, or Taylor and Dozier, or Dozier, is that how it's pronounced? Dozier, yes. Dozier are telling the truth. Yes. That's what we sent back to the district that impacts the district court's credibility determination as to the state's witnesses, Foltz and Mielke. Your honor, the district court did say that it was relevant to credibility, considered its significance for purposes of the credibility of Mr. Taylor, and said, well, it does boost his credibility, but not enough to get over the difficulties I have with Mr. Taylor. And to be fair, and to be fair, I was trying to go along with you about that, but the district court held a hearing. The district court listened to all the evidence and all the witnesses, even giving Taylor some credit. The district court says Taylor's testimony is discredited because of several things. One, he had a prior conviction for a crime involving dishonesty. Two, he had used 12 prior aliases. Three, there were major inconsistencies in his testimony and implausibility, and four, the recantation was credible. So the court said, hey, at this point, I don't think that Taylor is at all credible. And he, and the district court, she listened to the Foltz and Mielke and said, they're credible. Then the district court listened to Dozier and said, this isn't credible. Yes, Your Honor, but the district court also considered the relevance of the spoliation to the credibility of Foltz and Mielke, and said that it would substantially undermine their credibility if they were affiliated with the Department of Justice, but they are not. It's our contention that she was correct in saying that it would significantly undermine their credibility, and that she made an error of law in saying that they were not affiliated with the Department of Justice in this context. But I think the problem that we're struggling with is she gave you the adverse inference, which essentially establishes that Morgan was present in the house on the day that the murder was committed, and that was suggested to the jury that heard the original criminal case and had to, because that was Earp's testimony, that it was the other guy, Morgan, who did it. So I'm still having a hard time understanding how this somehow overturns the adverse credibility ruling that Judge Morrow made, inciting a number of factors which Judge Smith recounted as to why she didn't believe Taylor and Dozier. Well, Your Honor, she did not consider, and she specifically says that if Foltz and Mielke had been affiliated with the Department of Justice, it would have significantly undermined their credibility, but she doesn't consider that. I mean, I'm looking, for example, at page 42 of her order, at line 14, where she says the court has read and considered the evidence Earp has proffered concerning the loss of the fluid-soaked napkin and possibility of the stained pillowcase, and has drawn the adverse influence Earp sought. Specifically, the court accepts as true, for purposes of Earp's petition, that the napkin would have shown Morgan was present at Amanda's home on the date of her death. This fact, however, does not alter the court's conclusion respecting Earp's prosecutorial misconduct claim, which is the only claim that remains to be adjudicated. I read that passage as saying, I've given you your adverse spoliation, but for all the reasons that I cited, I find the defense witnesses to be not credible, and this evidence to be unpersuasive in altering that conclusion, and I find the state's witnesses to have told stories that are plausible, internally consistent, and believable. Now, applying the deferential standards of review to both the discovery ruling and the adverse credibility finding, how can you say that you have met the high bar that would warrant reversal here? Your Honor, if you go on to page 43, you will see the discussion, the brief discussion, of the potential impact, the impact that this spoliation finding could have on the credibility of Mielke and Foles, and she describes it as something that would significantly undermine their credibility, except that they aren't affiliated with the Department of Justice. The implication, very clearly, is if they were affiliated with the Department of Justice, it would substantially undermine their testimony, their credibility. Mr. Gerstein, I'm looking at line three on page 43, and she says, I quote, finally, because the inference is that the California Department of Justice destroyed the evidence or allowed it to be lost, not Foles or Mielke, neither of whom is affiliated with that organization. It does not significantly undermine their credibility concerning what transpired during the interview with Taylor. Yes. And she had Taylor on the witness stand, and his words spoken at the jail on tape, and found him not credible. I read this as saying, this evidence, this spoliated evidence, just doesn't influence the adverse credibility. Your Honor, she said it doesn't influence because they're not affiliated with the Department of Justice. That's not how I read that passage. I read that passage to say, when I weigh all of that against what I heard on the tape and what I saw in the courtroom when I watched the beady eyes and the sweaty palms of the witness, that spoliated evidence doesn't change my conclusion that Taylor was a liar. Well, Your Honor, all I can say is I would ask you again to look at that unaffiliated finding, and we regard that as significant because we do believe that as a matter of law, we have shown that as a matter of law, they were affiliated. And you assume, we must conclude then, affiliation means they're liars. Not necessarily, Your Honor, but that it could impact, first of all, that it would impact their credibility. Secondly, she, in talking about discovery. How would it impact their credibility? Well, it would impact their credibility specifically and especially if we got the discovery and determined that there was bad faith involved here. If the discovery showed that they were in any way implicated. I think we have to go further. I think your position, as I understand it, and maybe I don't understand it, if you put somebody who's connected with law enforcement on the witness stand, don't believe them because they're going to lie. Oh, absolutely not, Your Honor. But if we know from various authorities that we have cited in our briefs that if what we're dealing with is an agency of government, or for that matter, a corporation, which has been found guilty of spoliation, that that tends to undermine their credibility. The fact that they spoliated evidence leads to a reasonable inference that the district judge took here that the evidence probably would have redounded against them. And secondly, affects their general credibility. Doesn't say they're liars, but does raise questions. You have to make the best argument you can make, so go ahead. Well, that's, Your Honors, I would like to keep the rest of my time for rebuttal. That is one question I'd like you to answer before you sit down. As we move to the second issue, and I'm sorry that I'm stuck on standard review every time. Yes. But as we move to the second issue, in the weighing the evidence presented to it, what is my standard of review that I have in evaluating the district court decision? Well, it's a question of fact, so it's . . . Just a minute. What's the standard of review? Substantial evidence, Your Honor. It is clear error. And clear error, yes. Okay, so after everything you've said, I've got to say the district court clearly erred. You're suggesting that after all you've said, that means the district court who made this decision with a good hearing and trying to wade through all of this, with you being there, giving your best effort, you may not have been, but your best counsel was, and they said no. And I say to myself, okay, he argues facts that are different from other facts, but that doesn't take care of clear error. Clear error review is pretty tough to overcome. Yes, Your Honor, understood. And I don't think . . . I'm trying to figure out how you got there. I don't think you do. With all the arguments you make, you don't beat clear error. All right. Because I can give . . . the district court could have erred, could have done all kinds of things, but that's not clear error. Well, Your Honor, as to clear error, the principal point would be that point about finding no affiliation when, in fact, it's a matter of law. We believe there was affiliation. Secondly, with regard . . . we've made the case, and our principal point is that there should have been discovery here. But just a minute. Already the district court has given you the benefit of spoliation and given you facts as it relates to spoliation. So they are a part of the Department of Justice. So they are. I don't know how that overcomes clear error. Because you got the benefit of the doubt that there was spoliation and that the government did it wrong. And they put Morgan right there in the place. And they took that into effect, the district court, in this hearing in trying to evaluate who to believe. They took that into effect. And I read to you what she said after all is said and done. I can't get there because. And that had nothing to do, nothing to do with not giving Morgan every benefit of the doubt that he was there. Well, Your Honor, what I would say is that the district court took the spoliation, took the adverse inference into account in judging Taylor's credibility, but not in judging the credibility of Foltz and Mielke. Did not take it into account in any respect. And that failure results in a fundamental question about discovery. Because our contention is that discovery could well show, and we believe we've shown a nexus here, that it could well show that there was implication of those two witnesses in this process and or that there was bad faith involved. Before you sit down, I know there was an 11th hour motion filed earlier this week. Yes. Could you explain to us, I realize it's outside the record, but what's going on with regard to the Los Angeles County Superior Court? Well, at the moment, Your Honor, the Los Angeles County Superior Court has issued an order to show cause with regard to how the loss of this evidence could be the basis for, we contend it is the basis for, a new claim of actual innocence based on newly discovered evidence. Okay. So if we deny relief on the issue that we sent to Judge Morrow to try, then you're confident that you're going to get another shot in the state courts on a claim of actual innocence? Well, right now we have cleared the first and very significant barrier establishing, as the Superior Court said, a prima facie case. So, yes, we will get another shot. So we can resolve the witness intimidation claim and you'll still be free to litigate in the state court a new claim of factual innocence? That's absolutely correct, Your Honor. Our motion was for the purpose of making the point simply that we want to let this court know that there is another proceeding going on that may in effect moot what's going on here in the sense that we could get a result which will make this court's decision unnecessary. Well, that's true. On the other hand, let's take the other side of the coin. If you don't get the result that you hope to get in the state court, then there's no reason not to resolve the witness intimidation claim now since we've spent all this time studying the record for the third time, at least for some of us, and resolve this claim. That is certainly true. There are two sides to the coin, Your Honor, but we wanted to put it before this court and give this court an opportunity to decide that. Thank you, Mr. Gerstein. I'd like to reserve a little bit of time anyway. Thank you. Absolutely. All right. Mr. Bilobac, nice to see you again. Thank you, Judge Solomon. It's good to see you too, sir. Welcome to the case, Judge Smith. Thank you. It seems like the court is largely interested in the question of the discovery issue that Mr. Gerstein spent the bulk of his time talking about, so I'll concentrate my comments . . . We're interested in both, but he took off there, so I gave him what I thought were relevant issues as to that subject, and then I came back to the weighing of the evidence. Well, and I think that Mr. Gerstein's comments and the court's comments reveal that the claim of 6B, of whether or not Petitioner produced substantial evidence in support of that claim, is pretty well settled on this record. He did not. The evidence that was presented was not credible. The district court found it to be so. That finding was for the reasons I've laid out in my brief, and as you've echoed in your questions to Mr. Gerstein, it was pretty well supportable under the very, very high standard of clear error. And so, again, I think that that issue is frankly the least interesting issue, albeit the only issue of merit left before this court. The more interesting issue is the question of whether or not the district court should have granted discovery, which is Mr. Gerstein's chief complaint on the appeal and occupied the bulk of his time in the briefing and this morning, or this afternoon. And on that question, no, and Your Honor is precisely correct. The question of whether or not discovery was improperly denied is a question of abusive discretion, and in this case it's impossible to conclude that Judge Morrow abused her discretion because the allegations made that were supporting the request for discovery, at the end of the day, would have supported, in its most favorable light to the petitioner, the conclusion that Morgan was at the house. That's the best conceivable outcome from that evidence. We're a long way from there. There's many, many presumptions we have to go through, not all of which may end up being factually supportable. And as Mr. Gerstein said in response to your question at the end, Judge Tallman, there is an L.A. County Superior Court proceeding going forward where we're going to examine those questions and the factual questions very, very closely. But putting that broader question aside, they got the best possible inference from Judge Morrow on that, which is it would have placed Morgan in the house. And she said, and I think quite rightly, that even if you place Morgan in the house, that doesn't really have a profound effect on the credibility, particularly and most importantly, of course, of Michael Taylor, who was really the only essential witness on the question raised by Claim 4B, 4B being the denomination of the one remaining claim in the case. And so once we have Michael Taylor testifying, and he was the first witness at the evidentiary hearing, and you conclude, as Judge Morrow did and as I did when I watched Mr. Taylor testify, that he is not telling the truth when he discusses his interactions with Fultz and Mielke, nor is he telling the truth when he discusses what he claims he overheard from Dennis Morgan. When you put all of that together, there's really nothing left to talk about in this case. We have a complete absence of reliable, credible evidence in support of the claim. The Cindy Dozier evidence, she was also, the district court found, not being accurate in her testimony as well. She was a collateral witness, and I would say substantially less important to the just resolution of this case, not to diminish the fact that this Court sent us back down for the specific purpose of taking her testimony, but at the end of the day, Michael Taylor is the show in this case, and Michael Taylor was not being truthful in his testimony. And we know he wasn't being truthful in his testimony for a bunch of reasons that I won't go over again because the Court articulated them pretty soundly. The one I will emphasize to the Court, and if the Court hasn't taken the opportunity to do this for itself, I encourage you to do so, is go ahead and listen to that tape. Listen to the contemporaneous statements. The statements taken that are audio recorded in the conversation between Fultz-Milkey and Taylor on the day of this purported coercive conduct. And it's perfectly clear to any rational listener that it just never happened. It's a very calm, very conversational, very spontaneous discussion. The notion that he was being coached or was parroting responses that were prepared for him, he is not such an enormously sophisticated actor that I think that he tricked us into believing something that was so flatly untrue. And given Petitioner's sort of pattern of practice in this case of trying to find witnesses to testify falsely on his behalf, Taylor was just the next one in line. He tried to do the same thing with Dennis Morgan previously. So it's not at all surprising or unusual that that's what happened in this case. It's unfortunate, of course. It's always unfortunate when people try to suborn perjury. But Michael Taylor, at least for a period of time, was unwilling to go along with it. And that was the determination that Judge Morrow made, a completely supportable determination, based upon all of those factors we've discussed. And especially because, and as I pointed out to the Court, not only is it clear error, but when, as in this case, what we're talking about is competing versions of the events from two testifying witnesses that are irreconcilable. And a judge has to make an election between those two. Not only is it clear error, it's virtually never clear error, as the U.S. Supreme Court has instructed us. So we are not in that tiny, tiny, slender minority of cases where we're going to throw out a factual determination based upon anything that happened during the hearing or anything that didn't happen during the hearing, such as this excess discovery. And I want to talk about one other thing. And it was only because the Court invited Mr. Gersing to discuss it that I'm going to proffer these statements. Some of the things I'm about to say are outside the record. So if you want to put them. Well, I mean, I opened the door. Exactly. So I will give you an opportunity to respond to my question. And feel free to put the brakes on me if I go too far off the reservation. I appreciate that, Your Honor. I'm not hesitant. The reason that we went, that the DOJ went to examine this material in the first place, which was a question that the Court had, was because Mr. Gersing, Mr. Gitts, God rest his soul, and Ms. Picard asked me to. We were conducting discovery. This was back in 2001, before Penn-Holster. It was the Wild West in terms of discovery in federal habeas, especially in capital cases. And there was a lot of informal discovery and formal discovery. And they had propounded this as a request for formal discovery, specifically the question of whether there was a testable amount of material left. And they asked me to informally go and take a look, see if I could get in, because I have a better relationship with the LA County Sheriff's Department than the Office of the Federal Public Defender does. And so they asked me if I could send one of my agents over to take a look at this material and see if there was a testable amount, because if there isn't a testable amount, then this was shortly after California had enacted its DNA testing statute, 1405, the California Penal Code. It was very shortly after that. And I think it was clearly that was what was animating this, is they were trying to sort of use the federal discovery process with the hopes that they might develop something that would allow them to ultimately file a 1405 motion, which is in fact what they ultimately did. And they ultimately did because my agent went out there and he took a look at it and said, yes, there is a testable amount of material there. I reported that back to Mr. Gerstein, Mr. Geertz, and that was basically it. And that's what happened back in 2002. So this notion that something mysterious or untoward or sinister was going on and why in the world was a DOJ agent going to look at this material, it's because the defense asked me to and I acceded to that request. I probably let you go about as far as I should. Fair enough. I'll just stop there. I do have one more general question, which is also outside the record, but I think I'd like to know the answer. Sure. I assume that for smaller law enforcement agencies in California, the California Department of Justice normally serves as the state crime lab for agencies that don't have their own, but the Sheriff's Department in Los Angeles County is big enough that they do have a scientific investigation branch that can do a lot that other agencies would have to send to DOJ. Yeah, that's exactly right, Your Honor. And, in fact, this stuff was in the custody and control of the LA County Crime Lab. Which is in the Sheriff's Department. Which is part of the LA County Sheriff's Department. That's exactly correct. And one last point. On the remand order, I understand that Judge Morrow found for the purposes of federal habeas analysis that there had, in fact, been spoliation. I just want to push back a little bit. The fact of spoliation has not yet been competently established. It's been alleged. Right. And I think she was clear in her order to say, I'm assuming for the sake of resolving this petition that he's entitled to the adverse inference. And that's my best reading of it as well. But I just want to make sure, because that is one of the specific questions in the LA County order is whether the material is actually missing. Exactly. In state court, whether you're now collaterally estopped to deny that. That's exactly right. And with that, we would ask that the judgment be affirmed. Thank you very much. Before you sit down. Oh, I'm sorry. No questions. Okay. Thank you. Thank you very much. Well, I have just a couple of minutes. One point I certainly want to make with regard to what counsel just said. I've known him for a very long time. I know him to be an honest man. However, what he said was not in the record. And the fact is that for whatever reason, the government has offered no explanation of what happened at that time and what happened to that evidence on the record. But aren't you going to get into that in your Los Angeles Superior Court? Well, we certainly will, Your Honor, but we'd like to get, we do believe that it's. You don't want us opining on that, do you? If we don't have a supportable basis in the record. Well, we would like to, Your Honor, we would like to get a supportable basis in the record when we come back before you again, perhaps with the discovery that would tell us what happened. That would resolve this mystery. But the issue before us now is whether or not Judge Morrow abused her discretion. Yes, Your Honor. In denying your discovery request. Vis-a-vis the issue that it took us two appeals to finally get to hearing on and a reassignment to Judge Morrow. Yes. Okay. So if you've got a basis to establish actual innocence through DNA testing or an inference from spoliation, you can make that pitch to the state court, Judge. And I'm sure they'll carefully consider it. But one final point, my last minute here. Once again, and I would just ask this court to look at this carefully in Judge Morrow's order. She considers the inference that Morgan was there for purposes of Taylor's credibility. She does not consider it in any respect with regard to Foltz and Mielke's credibility. And it's our contention that discovery could give rise. I mean, we have to make a huge inference. I shouldn't use the word inference since we're talking about adverse inferences. She has to make a huge leap of faith that if there was a deliberate effort made to lose this evidence between the county and the state crime labs, that Mielke and Foltz somehow had a hand in telling the custodian of the evidence or the analyst at the crime lab, lose this material so that Earp will never be able to get his hands on it and have it privately tested. Isn't that where you hope the evidence will be? Well, that's one possibility, Your Honor. It could also be that they were implicated somewhat less directly, somewhat less severely, but that still they were implicated somehow. So that there was some sort of overarching grand conspiracy? Well, Your Honor, we don't know the answer. To an innocent man. Is that the theory? Not necessarily. We have a conviction here to defend the conviction that they worked so hard, the conviction and the sentence that they worked so hard to get some years earlier and which they have faithfully defended. So they were on the same team. That's our contention. It's not as complicated a case as I think you would hope it would be. How many people were in the house under this record? Well, Your Honor, that's, of course, the question we are asking. No, but the court said we'll assume that there was the person who was accused of the crime, the deceased, the baby, and now we'll put the other person in there. So we'll put the three people in there if we want to. And isn't that pretty much the whole show? Well, that with, of course, with regard to our claim currently in the state courts for actual innocence, that certainly is, because the basis, there was no physical evidence here. The basis for this conviction is that the petitioner was alone with the baby. Well, there was physical evidence. The baby was certainly sexually assaulted. Yes. That's physical evidence, isn't it? There was no physical evidence that the petitioner was the person who assaulted her. All right. The only basis of the case. You wanted to put a third person in the house, and you did. So now you've got the person who was accused, his friend, well, a person, Morgan, who says he wasn't there, but you, the court says, well, let's assume he was there, and the baby. Now, who else was in the house? That was all, Your Honor. All right. So it's not such a complicated case. And you did leave out his flight after the baby was removed. That, again, is circumstantial evidence. But it was evidence that the jury considered in deciding whether or not he ran because he was the perpetrator of the crime. Certainly was, Your Honor. But, of course, here we are, again, focused on the question of impact on credibility, and mainly the possible impact on credibility of resolving this mystery as to what happened to that evidence. Now, there may be nothing there, but our contention is that we have shown that there is a significant nexus in the fact that it disappeared during those proceedings at a time when Foltz and Mielke were involved, at a time when there was a focus on whether that evidence could be a basis for overturning this conviction. I think, Mr. Gernstein, we have your argument well in hand. I thank you very much for your argument and for your continuing representation of Mr. Earp, and we'll see you in five years. Thank you, Your Honor. I look forward to it. It's a pleasure to be before you. We are adjourned.
judges: Farris, Tallman, N.R. Smith